IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TAYLOR F., individually and as parent and           )
natural guardian of T.F., a minor,                  )
                                                    )
                      Plaintiff,                    )
                                                    )
          vs                                        )        Civil Action No. 18-1397
                                                    )
LAWRENCE COUNTY, LAWRENCE COUNTY                    )
CHILDREN AND YOUTH SERVICES and                     )
JOSHUA LAMANCUSA, individually and in his           )
official capacity,                                  )
                                                    )
                      Defendants.                   )

## MEMORANDUM OPINION

Plaintiff, Taylor F., individually and as parent and natural guardian of her minor son T.F., brings this action pursuant to 42 U.S.C. § 1983, alleging federal civil rights and state law claims against Defendants Lawrence County, Lawrence County Children and Youth Services ("CYS") and Lawrence County District Attorney Joshua Lamancusa ("Lamancusa").

Currently pending before the Court is Defendants' motion for summary judgment. For the reasons that follow, their motion will be granted with respect to the federal claims and the state law claims will be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

### I.    Procedural History

Taylor F. commenced this action in October 2018. Federal question jurisdiction is premised upon the § 1983 claims, 28 U.S.C. § 1331. Supplemental jurisdiction is asserted over the state law claims pursuant to 28 U.S.C. § 1367.

Count I of the Complaint asserted claims of procedural and substantive due process against all Defendants arising out of her son T.F. being taken from Taylor F. without reasonable grounds, kept in protective custody without benefit of a formal hearing and kept from Taylor F.

until she testified in a criminal trial. Taylor F. pleaded a conspiracy claim against all Defendants in Count II of the Complaint for depriving both her and T.F. of their procedural and substantive due process rights. In Count III of the Complaint, Taylor F. asserted a claim under § 1983 against Lawrence County and CYS for their failure to protect T.F. while he was in foster care. Counts IV and V[1] set forth Taylor F.'s state law claims against Lamancusa for assault and battery, respectively.

On December 19, 2018, Defendants filed a motion to dismiss (ECF No. 8). Magistrate Judge Mitchell[2] filed a Memorandum Opinion and Order on May 28, 2019 (ECF No. 23) that granted Defendants' motion in part and dismissed as time-barred Taylor F.'s individual claims in Counts I through III. As a result, the remaining claims in this action are those asserted on behalf of T.F. in Counts I, II and III and Taylor F.'s state law claims for assault and battery against Lamancusa.

On June 12, 2020, after the close of discovery, Defendants moved for summary judgment with respect to the remaining claims (ECF No. 56). Their motion has been fully briefed (ECF Nos. 57, 63, 64).

## II.     Factual Background

The claims in this case arise out of three separate but related incidents. First, Taylor F. contends that T.F. was wrongfully removed from her custody on November 18, 2013 and was not returned to her until October 12, 2016, and only after she testified for the Commonwealth at a criminal homicide trial. Second, during this time, T.F. was placed in various foster homes where he allegedly was subjected to abuse and neglect that Defendants failed to address. Finally,

---

[1] The Complaint refers to this claim as "Count 4," but this appears to be a typographical error.

[2] The parties have consented to full jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). Following Magistrate Judge Mitchell's retirement, this action was reassigned to the undersigned.

Taylor F. alleges that Lamancusa engaged in offensive sexual contact with her.

A.  <u>The Removal of T.F. and His Placement in Foster Care</u>

On November 15, 2013, seventeen-year old Taylor F., accompanied by her son, T.F., was present in an apartment with several of her acquaintances. T.F. was less than four months old at the time. (Defendants' Concise Statement of Undisputed Material Facts ("DCSMF") ¶¶ 1-2.)[3] In the early morning hours of November 16, 2013, Leon Platt shot and killed Richard Hogue in the living room of the apartment. Taylor F. and T.F., who was in a car seat, were in the room when the shots were fired and witnessed the event. Taylor F. called 911 and waited with the victim. The other individuals who were in the apartment fled. (*Id.* ¶¶ 3-4.)

At the time of this event, Taylor F. and T.F. were living with her parents. Leon Platt also stayed there on occasion. Following the shooting, Leon Platt went to the home of Taylor F.'s parents and called her while she waited for the police and ambulance. When the police and ambulance arrived at the scene of the shooting, Taylor F. did not initially identify who did the shooting. Eventually, she told the police that Leon Platt shot Richard Hogue and reported that he was at her parents' house. When Taylor F. arrived home after the shooting, the police had surrounded the house. Taylor F.'s parents spoke to the police and allowed Taylor F. to be interviewed regarding the shooting. (*Id.* ¶¶ 5-9.)

The police transported Taylor F. to the police station to be interviewed. During the interview, she did not tell the police about certain activities in which she and Leon Platt had been involved. Taylor F. was interviewed by the police a second time regarding the murder of Richard Hogue on November 18, 2013. During this interview, Taylor F. admitted that a few days before the shooting at the apartment, as well as earlier on the night of the shooting, she and Platt drove

---

[3] ECF No. 58. Taylor F. has not disputed many of Defendants' statements of fact, except as indicated below.

around in her car with the plan of shooting up another individual's house. She was in the driver's

seat of her car when Leon Platt fired 5 or 6 shots at a house. (*Id.* ¶¶ 10-12.)

It was reported that during the interview, Taylor F. was difficult with the police. (*Id.*

¶ 13.) Specifically, as documented in the incident report:

> The interview was over Taylor [F.]'s involvement in two different shootings over the weekend. In one of the incidents a man was killed in the Walnut Right Housing Projects and [she] was a direct witness to the homicide.
>
> At the end of the interview Ptl. Damon and Lt. Kingston advised Taylor [F.] that the police needed her cell phone. This upset Taylor and she stuffed the phone down her shirt and refused to give it to the police. The phone was material evidence in the homicide. [Taylor F.] was yelling at police to "F*** your self" and continued to refuse to give up the phone after repeated request from the police.
>
> Lt. Kingston summoned help from several other officers and had Cindy Magnifico who is police clerk/dispatcher . . . assist in the search. [Taylor F.] refused to let Police Clerk Magnifico take possession of the phone. Lt. Kingston and Ptl. Damon had to hold [Taylor F.] by her arms while Magnifico attempted to get the phone from her shirt. Clerk Magnifico attempted to reach down her shirt for the phone when [Taylor F.] attempted to bite Magnifico's right hand. Police had to struggle with Taylor F. and place her on the ground due to her flailing around with her elbows and legs. This was in an attempt to defeat the search and injury officers. [Taylor F.] refused to give the phone to police after repeated warnings and was tased. Police were able to hold [Taylor F.] down safely so that Magnifico was able to search [Taylor F.] and get the phone.
>
> [Taylor F.] continued to struggle with police and was placed face down and handcuffed for Police Safety. [Taylor F.] was immediately picked up and escorted to cell 2 because of her continued attempts to injure officers. [Taylor F.] was placed in cell 2 until she was placed by her Juvenile Probation Officer Tim Cross.

(ECF No. 60 Ex. D at 4.)

As a result of her conduct during the interview on November 18, Taylor F. was removed

from her parents' home where she lived with T.F., placed at a juvenile detention facility and

charged with aggravated assault, resisting arrest, and tampering with evidence. (DCSMF ¶ 14;

ECF No. 60 Ex. D at 1-2.)[4] Judge Motto of the Court of Common Pleas of Lawrence County granted an *ex parte* order on November 18, 2013 for the removal of T.F. from Taylor F.'s custody. The same day, a CYS caseworker removed T.F. from the home and placed him in foster care. Taylor F. was provided with written notice that T.F. had been accepted for ongoing service by CYS. After T.F. was removed, Taylor F. and T.F.'s father, "Timothy R.," met with a CYS caseworker to discuss this matter and establish a service plan. (DCSMF ¶¶ 15-17.)

A seventy two-hour hearing was scheduled for November 21, 2013. Taylor F. and Timothy R., as well as Taylor F.'s attorney and a guardian ad litem for T.F., attended the court proceeding and waived a formal hearing. On November 26, 2013, Taylor F. pled guilty to disorderly conduct for her involvement in the actions leading up to the murder of Richard Hogue. She was sentenced to probation and house arrest and returned home to her parents' house. (*Id.* ¶¶ 18-19.)

An adjudication hearing regarding T.F. was held on December 17, 2013 which Taylor F. and her attorney, among others, attended. T.F. was adjudicated dependent by the Court pursuant to 42 Pa. C.S. § 6302-Dependent Child (1) based on a finding that he lacked proper parental care. Taylor F. and Timothy R. entered into service plans with CYS with the goal of reunification with T.F. Taylor F. understood that her service plan required her to refrain from criminal activity and was necessary in order to regain custody of T.F. The service plan also required, among other things, that Taylor F. undergo anger management, drug testing, parenting classes, and mental health assessments. Taylor F. was also required to maintain appropriate housing and cooperate

---

[4] Defendants state that the charges were the result of Taylor F.'s "statements" during the interview. Plaintiff disputes this description. The evidence of record includes the Juvenile Petition, which makes it clear that her *actions* of refusing to turn over the cell phone, trying to bite the dispatcher's hand and struggling with officers led to the filing of charges against her.

with CYS and probation.[5] Permanency review hearings were held with the Court every few months relating, in part, to the compliance of Taylor F. with the service plan, and also to allow the court to review the need for continuing placement of T.F. (*Id.* ¶¶ 20-25.)

A hearing was held to determine if Taylor F.'s mother, T.F.'s grandmother, could be eligible for kinship foster care. Because Taylor F. was living at her parents' home and on house arrest, kinship foster care to T.F.'s grandmother was denied by the Court. (DCSMF ¶ 29.)[6]

B. Taylor F. Testifies at the Preliminary Hearing

On the afternoon of December 17, 2013, Taylor F. testified at the preliminary hearing of Leon Platt for the murder of Richard Hogue. In preparation for the hearing, she met with two assistant district attorneys. She did not meet with District Attorney Lamancusa. (*Id.* ¶¶ 26-27.)

Lamancusa had no personal involvement in the prosecution of Leon Platt for the murder of Richard Hogue. (*Id.* ¶ 28.) While Taylor F. disputes this, noting that it was Lamancusa's office that prosecuted Platt (Plaintiff's Response to Defendants' Concise Statement of Undisputed Material Facts ("PRCSMF") ¶ 28),[7] she did not produce any evidence of his personal involvement in the case. An assistant district attorney prosecuted the Platt case. (Lamancusa Dep. 6.)[8] Lamancusa's only involvement was to wait with the family of the victim while the jury deliberated. (*Id.*)  Taylor F. never met with Lamancusa relative to her testimony in the case. (Pl.'s Dep. 61-62.)[9]

---

[5] Timothy R.'s service plan had similar requirements. He eventually lost contact with CYS and abandoned his plan to take custody of T.F. (ECF No. 57 at 7).

[6] While Taylor F. disputes this statement as immaterial she does not dispute its accuracy. As Defendants note, the placement of T.F. in agency party foster care is material to the extent the Complaint alleges that they conspired to keep T.F. separated from her.

[7] ECF No. 62.

[8] ECF No. 60 Ex. K.

[9] ECF No. 59 Ex. A.

C. <u>T.F.'s Experience in Foster Care</u>

Taylor F. was permitted supervised visits with T.F. while he was in foster care. During a February 21, 2014 supervised visit, Taylor F. complained that T.F. had diaper rash. During her next visit on February 24, 2014, Taylor F. again complained about the diaper rash and voiced concern that T.F. had bruising on his body and burn marks on his chest. CYS Supervisor Lisa Matteo spoke to Taylor F. about her concerns. (*Id.* ¶¶ 30-32.) T.F.'s foster mother reported that she had taken him to the doctor the week before.[10] The doctor believed the diaper rash was from teething or his formula. His foster mother changed T.F.'s formula to soy and applied ointment to the rash, which appeared to be alleviating the issue. (*Id.* ¶¶ 33-34.)

Ms. Matteo examined T.F. and noticed that he had a mild diaper rash which appeared to be healing. She also checked T.F. for bruises but did not observe any. T.F. was then scheduled for a doctor's appointment at Children's Hospital on March 6, 2014. (*Id.* ¶¶ 35-36.)

Taylor F. disputes these statements as "misleading" and asserts that "any investigation into [her] complaints was delayed until after the complained of injuries had healed." (PRCSMF ¶¶ 35-36.) As Defendants note, however, her two February visits occurred three days apart and she made no complaint of diaper rash during her next supervised visit on March 4, 2014. (ECF No. 60 Ex. E at 33.)

Taylor F. attended T.F.'s appointment at Children's Hospital on March 6, 2014. A physician who examined T.F. determined that he did not have bruises but, rather, had marks called Mongolian spots. He noted that the diaper rash was healing and indicated that it is

---

[10] Taylor F. disputes the admissibility of this and similar evidence regarding the foster mother's conduct because it represents hearsay. Even if inadmissible to prove that the foster mother actually engaged in these actions, it is admissible to show that CYS was advised that these actions took place, conducted its own independent investigation and reached its own conclusions about T.F.'s condition.

common and not indicative of abuse and/or neglect. As a result, any report of abuse or neglect against the foster parents was deemed to be unfounded by CYS (DCSMF ¶¶ 37-39.)[11]

T.F. remained in this foster home until April 11, 2014, when the foster parents determined they could no longer serve in that role given the needs of other children in their home. (*Id.* ¶ 40.)  T.F. then went to another foster home.

Roberta Collella, a nurse from Family Partnership, an agency that contracts with CYS to provide parenting classes and support, attended a supervised visit between Taylor F. and T.F. on August 25, 2014, in order to speak with Taylor F. and assess her interactions with T.F. The nurse weighed T.F. at that time. During another supervised visit on September 5, 2014, T.F. would not eat the Cheerios sent by his foster mother or drink the bottle given to him by Taylor F. CYS caseworker Fredrick Lang subsequently received a report from Ms. Collella on September 15, 2014 that T.F. was losing weight and she thought that he might be malnourished or have a stomach issue. (DCSMF ¶¶ 43-46.).

The same day, CYS visited T.F.'s foster home and found that food was plentiful. The foster mother reported that T.F. was fussy but ate a lot. On September 22, 2014, Ms. Collella again reported her concern with T.F. losing weight. (*Id.* ¶¶ 47-48.) As a result, T.F. was taken to the emergency department at Children's Hospital where a doctor indicated that T.F. should be monitored by his primary care physician. T.F. was then taken to his primary care physician on September 29, 2014, but no concerns were noted. (*Id.* ¶¶ 49-50.)[12] Because Taylor F. slept in,

---

[11] Again, Taylor F. disputes these statements on the ground that the investigation was delayed until the complained of injuries were healed, but as previously noted, this is contradicted by the record.

[12] While Taylor F. disputes this as misleading, Defendants have provided the records associated with this examination, which state that T.F.'s exam was "normal" and that he appeared "well nourished." (ECF No. 60 Ex. Q at 1.)

she missed the September 29, 2014 supervised visit with T.F. (*Id.* ¶ 51.)[13]

T.F. continued to lose weight and was taken to Children's Hospital on October 17, 2014. He was diagnosed with failure to thrive, but there was no indication that this diagnosis stemmed from abuse or neglect. (DCSMF ¶¶ 53-54.)[14] The hospital records reflect that the foster family took "meticulous reports" of T.F.'s intake and indicated that T.F. "eats voraciously." He was admitted to the hospital for monitoring given the limited information available with respect to his bowel movements. (ECF No. 60 Ex. Q, UPMC ED Non-Attending (Preliminary) at 1.) When it was determined that T.F. was "severely constipated" (ECF No. 59 Ex. A at 124-25), he was treated for this condition. Upon discharge, it was recommended that T.F. be given "soy milk instead of regular milk." (*Id.* at 125-26.) T.F. was discharged on October 21, 2014.

A state agency not associated with Lawrence County CYS conducted an investigation of the foster home to which T.F. was assigned and determined that any report of abuse or neglect was unfounded. (DCSMF ¶ 55.) While Taylor F. disputes this statement as "misleading" (PRSCMF ¶ 55), CYS's records note that they received "a call from [a caseworker] from the state today regarding Taylor [F.] and [T.F.] [The caseworker] stated she did the investigation on … the foster home which was unfounded." (ECF No. 60 Ex. E at 79.)

When T.F. was released from the hospital, CYS placed him into kinship foster care with Taylor F.'s grandfather. T.F. remained in kinship foster care with Taylor F.'s grandfather until March 2015, when he indicated that he could not care for T.F. in the short term due to issues he was experiencing with Taylor F. As a result, T.F. was removed from the home and placed into agency foster care. (DCSMF ¶ 56.) Taylor F. disputes that her grandfather said he was having

---

[13] Compliance with her service plan included attending all scheduled visits and cooperating with CYS. (ECF No. 60 Ex. J.)
[14] While she disputes that there was no indication of abuse or neglect, Taylor F. does not cite to any record evidence in support of this contention. (PRSCMF ¶ 54.)

issues with her (PRCSMF ¶ 56). However, the CYS case file states that the grandfather reported that "Taylor had been calling him and harassing [him] and [was] threatening to hurt herself if she did not get to see her child." (ECF No. 60 Ex. E at 85.) At another visit, he arrived 20 minutes early and "stated that it would be a fight if he and Taylor were around one another." (*Id.* at 87.) On March 5, 2015, he stated that "he is stressed as a result of his health and his family" and indicated that he could no longer keep T.F. (*Id.* at 92.)

In July 2015, while T.F. was in the care of new foster parents, the foster mother noticed behavioral issues with T.F. A doctor indicated that T.F. may have autism and the foster mother enrolled T.F. in early intervention programs through CYS. (DCSMF ¶ 63.)

D.  Additional Criminal Charges

In April 2014, Taylor F. was arrested for robbery and reported this to her caseworker. She was also arrested in July 2014 for burglarizing homes and cars in Beaver County. (*Id.* ¶¶ 41-42.)[15] On October 14, 2014, Taylor F. notified CYS that she had outstanding warrants in North Carolina and had to travel there to take care of them. (*Id.* ¶ 52.) Plaintiff states that these charges were a result of a "misunderstanding" (PRCSMF ¶ 52), but in her deposition, she testified that she pled guilty to charges having "something to do with a stolen motor vehicle" and "maybe" pled or was found guilty of charges of possession of drugs. (ECF No. 59 Ex. A at 75.)

In November 2014, Taylor F. was incarcerated relating to a stabbing incident. (DCSMF ¶ 57.) An Ellwood City police officer notified CYS of the charges. (*Id.* ¶ 58.) As a result of the charges, Taylor F. pled guilty to a charge of unsworn falsification to authorities and was sentenced to probation in June (ECF No. 60 Ex. R).

---

[15] Taylor F. disputes these statements as "misleading" because she was innocent of these charges. However, it is undisputed that she was charged with these crimes by a jurisdiction outside of Lawrence County. (ECF No. 60 Ex. O.)

In January 2015, Taylor F. was arrested in Steubenville, Ohio for DUI and possession of cocaine. When Taylor F. was released from jail, she contacted her CYS caseworker and acknowledged that because of her police involvement, it would be some time until reunification with T.F. could occur. (DCSMF ¶¶ 58-61.)

In February 2015, Taylor F. was arrested for drug trafficking out of her parents' home. In July 2016, she pled guilty to disorderly conduct related to these charges. (*Id.* ¶¶ 62, 66.)

Taylor F. was told that her criminal issues were hindering her ability to regain custody of T.F. CYS caseworker Lang, who worked on T.F.'s case, recalled that Taylor F. had many run-ins with the law that prevented her from moving forward to regain custody of T.F. Lang received updates about Taylor F.'s criminal issues from the police department. On at least one occasion, he called the District Attorney's Office and spoke to Assistant District Attorney Flannery about the status of Taylor F.'s case. (*Id.* ¶¶ 69-72.)

E. <u>Issues Related to Taylor F.'s Testimony About the Murder</u>

Defendants assert that no one from CYS told Taylor F. that she would get her child back if she testified regarding the murder of Richard Hogue. (*Id.* ¶ 73.) She disputes this, however, noting that she testified during her deposition that multiple CYS caseworkers and at least one CYS supervisor told her that she would not get her child back unless she testified regarding the murder. (PRCSMF ¶ 73.) She testified that:

> A. They promised me that I would get him back if I testified, which I did, and did not get him.
>
> Q. Who's they, when you say that?
>
> A. CYS and the district attorney.

(ECF No. 59 Ex. A at 45:15-19.) She "was under the impression that I was getting him back as soon as I testified. I thought at the preliminary hearing of that murder I was getting my son

back." (*Id.* at 54.)

> Further, she provided the following testimony during her deposition:
>
> A. I did everything they told me to. I even moved out of my house—my parents' house at 17 years old because they promised to bring my son back to my house. I moved out, was struggling, on house arrest, wasn't—being punished for being a victim in a murder, couldn't even go grocery shopping, couldn't get a job at 17 and was—moved out from my parents' to get my son back, but they did not give me him. I testified at the preliminary hearing. Tom Minett and whoever the lady was with him promised me my son back whenever I testified, so I testified at the preliminary hearing, and did not get him back.
>
> Q. Okay.
>
> A. CYS knew about this. Then they came out with a plan, and I did everything in their plan within three months and never got any additional time added onto my visits, never got nothing. They would not give him to his father, would not give him to anyone in my family, wouldn't give him to nobody. Family in North Carolina was coming up here, his dad's side of the family from Ohio was moving here, and they would not release my son to anyone.

(*Id.* at 50:2-25.)

Taylor F. asserts that CYS caseworkers told her they needed to call the District Attorney's Office regarding her criminal issues and charges. Defendants contend, however, that during her deposition, Taylor F. instead stated that CYS caseworkers told her they needed to contact the D.A.'s Office when she asked questions about wanting more visits. (ECF No. 59 Ex. A at 60.) Caseworkers would, at times, speak with the D.A.'s Office or the police to inquire about the status of criminal cases in CYS matters where the parent had criminal issues, as in this case. (ECF No. 60 Ex. L at 38.) However, there is no record evidence that the D.A.'s Office directed CYS how to proceed or that Lamancusa had any conversations with CYS or any of his assistant D.A.'s about Taylor F. (ECF No. 60 Ex. K at 30-32, 36, 45, 47; Ex. M at 9-10, 19.)

F.  Taylor F.'s Testimony at the Murder Trial

In April 2016, Taylor F. testified at the trial of Leon Platt for the murder of Richard

Hogue. The following exchange took place during the trial:

> Q. Has Children and Youth Services, CYS, taken custody of the child you had with you that night?
>
> A. Yeah.
>
> Q. Has the D.A.'s office or the police department provided you with any help concerning that CYS problem?
>
> A. No.

(ECF No. 60 Ex. C at 62.)

Taylor F. did not serve any jail time with respect to her pending charges because of her cooperation in the murder trial. (DCSMF ¶ 67.) Taylor F. contends that she was innocent of the litany of charges against her and was repeatedly promised that reunification with her son was contingent upon her testimony. (PRCSMF ¶ 67.) However, she pled guilty to disorderly conduct (reduced from charges of possession). (ECF No. 60 Ex. S.) As she testified during her deposition relative to the sentencing on that charge:

> Q: And then ultimately, with your lawyer's assistance, you worked out a plea for those possession charges, and the district attorney indicated on the record that your cooperation with the Platt case was a factor, isn't that right?
>
> A. Yes.

(ECF No. 59 Ex. A at 88.)

In October, 2016, six months after her trial testimony, upon the Court's determination that T.F. met the service plan requirements, a court order was issued for T.F.'s return to his mother's custody (DCSMF ¶ 68.)

G. Plaintiff's Interactions with Lamancusa

Taylor F. testified that she had three meetings total with Lamancusa–two in his office (in 2014 and 2016) and one at her parents' home in 2017. (ECF No. 59 Ex. A at 218-19.) There was

no discussion of the CYS matter during any of these meetings. (*Id.* at 170-86, 219-21; (DCSMF ¶¶ 88-93, 105.)

Taylor F. did not meet with Lamancusa before giving her testimony in the preliminary hearing in the murder trial of Leon Platt. Taylor F. met only with ADA Minette and ADA Jessica Sullivan. (DCSMF ¶¶ 74-77.) Lamancusa did not direct any assistant district attorney on how to deal with Taylor F. and was not involved in matters related to T.F. or any other CYS matter. (*Id.* ¶¶ 78-79.) While Taylor F. notes that the District Attorney's Office and local law enforcement agencies had regular contact with CYS (PRCSMF ¶¶ 78-79), Defendants assert that such contacts do not create an inference that Lamancusa himself was involved. Taylor F. did not have any conversation with Lamancusa regarding her CYS case and he did not tell her that her child would be returned if she testified in the murder trial of Leon Platt. (DCSMF ¶¶ 80-81.)[16]

Taylor F., who was 17 at the time, first went to Lamancusa's office in 2014. She testified that Lamancusa asked her to be a confidential informant and told her that "if you help me, I'll help you." According to Taylor F., Lamancusa told her that she was pretty and smart and did not need to be mixed up with people who were involved in a murder. Taylor F. testified that Lamancusa touched her hair and ran his hands down her back. Lamancusa then opened the door to his office and Taylor F. walked out. (DCSMF ¶¶ 82-87.)[17]

In the summer of 2016, Taylor F. again went to Lamancusa's office to discuss the current status of her pending charges and probation. She wanted to move to Louisiana with the father of her infant daughter but was told by probation she could not do so because her supervision could

---

[16] Taylor F. disputes these statements but cites no evidence in support of her denials. Moreover, she admitted that she did not meet with Lamancusa regarding her testimony. (ECF No. 59 Ex. A at 61-62.)
[17] Lamancusa disputes Taylor F's version of these events but as Defendants acknowledge, all inferences must be drawn in her favor as the non-moving party.

not be transferred. Lamancusa agreed to drop the charges against Taylor F. and release her from probation if she paid the fines. Lamancusa and Taylor F. also discussed the pending drug charges against her during this meeting. She reported the information that her charges would be dropped to CYS.

On January 2017 at approximately 2:00 a.m., Taylor F. received a Facebook message from Lamancusa asking where she was. She responded that she was at home at her parents' house. Lamancusa asked for their address and Taylor F. provided it to him. When Lamancusa arrived at the house, Taylor F. met him outside. Taylor F. testified that Lamancusa made her delete the messages he had sent her. (*Id.* ¶¶ 94-96, 98.)

Taylor F. and Lamancusa went into the house. She testified that Lamancusa began kissing her, while Lamancusa denies that he kissed her. Although Taylor F. never directly told Lamancusa to leave,[18] she testified that she pretended to hear her infant daughter crying and went to check on her. When Taylor F. returned with her daughter, Lamancusa said "maybe next time" and left. After Lamancusa left, Taylor F. sent him a Facebook message asking that he give her more notice the next time he came over. (*Id.* ¶¶ 99-104.)

There were no other meetings between Taylor F. and Lamancusa. (*Id.* ¶ 106.)[19]

---

[18] Defendants point to Taylor F.'s "admission" that she never told Lamancusa to leave (ECF No. 59 Ex. A at 212). In this instance, Plaintiff is correct that this statement, standing alone, is misleading, as it implies that Taylor F. was comfortable with or somehow welcomed Lamancusa's conduct. As noted above, she states that she invented an excuse to end the interaction.

[19] Defendants' Concise Statement describes Taylor F.'s encounters with the legal system since 2019 (DCSMF ¶¶ 107-12). Defendants assert that these facts are material and relevant because her brief states that "after Taylor testified … her troubles with law enforcement abruptly resolved." (ECF No. 63 at 7.) It is clear from the context, however, that Taylor F. meant only that the abrupt resolution of the criminal charges following her testimony constitutes evidence in support of her claim that the charges were used as a method to compel her testimony, not that she never had "troubles with law enforcement" after that date. Defendants have not demonstrated the relevance of these more recent developments.

III.    **Standard of Review**

As set forth in Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial;" otherwise, the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In considering a motion for summary judgment, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

A.  <u>Civil Rights Claims</u>

As provided in 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

As the Supreme Court has held, § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

The Fourteenth Amendment, which is implicated by the civil rights claims asserted on behalf of T.F., provides that states shall not "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

Taylor F. alleges that Defendants deprived T.F. of his liberty and privacy interest in his mother's custody without undue interference. This includes his right of familial association, his right to freedom of association and his right to substantive and procedural due process secured by the Fourteenth Amendment. Taylor F. further asserts that Defendants conspired to deprive T.F. of these constitutional rights and that Lawrence County and CYS acted with deliberate indifference to T.F.'s right to bodily integrity by placing him in multiple foster homes where he was mistreated.

"The integrity of the family unit has found protection in the Due Process Clause of the

17

Fourteenth Amendment." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). This fundamental liberty interest is not absolute, but "must be balanced against the state's interest in protecting children suspected of being abused." *Miller v. City of Phila.*, 174 F.3d 368, 373 (3d Cir. 1999) (citing *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)). Parents' interest in the care, custody and management of their children is also protected by the substantive due process clause. *Id.* at 374. Moreover, the Due Process Clause of the Fourteenth Amendment protects a constitutional liberty interest in personal bodily integrity. *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citations omitted).

With this background, each of the civil rights claims asserted on behalf of T.F. will be addressed.

### 1. Count I

In Count I, Taylor F. asserts procedural and substantive due process claims arising out of Defendants' acts of removing T.F. from Taylor F.'s custody and keeping them separated until Taylor F. testified against Platt at a criminal trial. Defendants assert that the undisputed facts confirm that they are entitled to judgment as a matter of law with respect to both the procedural and substantive due process claims.

#### a. Procedural Due Process Claim

Taylor F. has asserted a procedural due process claim on behalf of T.F. A procedural due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126, (1990). "Initiating child custody proceedings by *ex parte* orders is generally constitutional if a prompt post-deprivation hearing is held." *Miller*, 174 F.3d at 372 n.4. In *Miller,* the Third Circuit Court

of Appeals noted that Pennsylvania law requires a hearing within 72 hours of an *ex parte* order that results in the removal of a child from his or her home. *Id.* (citing 23 Pa. C.S. § 6315(d), 42 Pa. C.S. § 6332(a)). *See also* Pa.R.J.C.P. 1242(D) (requiring shelter care hearing to occur within 72 hours of child's removal).

Taylor F. asserts that T.F. was removed from his home and held for more than 24 hours without obtaining a court order and further, that he was held for more than 72 hours without a hearing in violation of 42 Pa. C.S. § 6332. However, the uncontroverted facts of record demonstrate that after Judge Motto issued an *ex parte* order on November 18, 2013 for the removal of T.F., he was removed from her custody the same day. Taylor F. was provided with written notice that T.F. had been accepted for ongoing service by CYS. A hearing was held on November 21, 2013, within 72 hours of T.F.'s removal. Taylor F. attended and waived a formal hearing. An adjudication hearing was then held on December 17, 2013, at which T.F. was adjudicated dependent by the court.

Taylor F. entered into a service plan with CYS that included a requirement for her to refrain from criminal activity before custody would be returned to her. Thereafter, periodic permanency hearings were held by the court to determine if Taylor F. met the conditions of the service plan that had been developed for her. She also had frequent contact with CYS caseworkers and supervised visits with T.F. (*See* ECF No. 60, Ex. E.) For a substantial period of time, she did not meet the condition that she refrain from criminal activity as she was subsequently arrested on various criminal charges in April 2014, July 2014, October 2014, November 2014, January 2015 and February 2015. When she testified at the murder trial on April 8, 2016, not all of the criminal matters pending against her were resolved. In July 2016, Taylor F. pled guilty to disorderly conduct arising out of drug charges. Consideration was given

for her cooperation in the Platt trial and she did not receive any jail time.

Once Taylor F. had completed all of the goals of the service plan, including the resolution of any pending criminal charges, the Court issued an order on October 12, 2016 that permitted T.F.'s return to his mother's custody. This occurred six months after Taylor F.'s testimony in the homicide trial.

Taylor F. disputes many of these facts but fails to submit any record evidence that creates a genuine issue of material fact regarding T.F.'s procedural due process claim. In fact, it is uncontroverted that CYS followed appropriate procedures for the removal of T.F., and thereafter, the required court proceedings were held, a service plan was developed, the status of T.F.'s custody was periodically reviewed by CYS and by the court, and T.F. was ultimately returned to his mother's custody after the Court found that she met the requirements of the service plan. Therefore, as Defendants indicate, there was the "opportunity to be heard at a meaningful time and in a meaningful matter" as the law requires. *Mathews v. Eldridge,* 424 U.S. 319 (1976).

Moreover, while Taylor F. asserts that Lamancusa violated T.F.'s procedural due process rights, Lamancusa's uncontroverted testimony was that he has no say in CYS matters. There is no evidence that he was involved in the removal of T.F. or had any communications with T.F.'s caseworker. He was not personally involved in the Platt prosecution, and made no promises that T.F. would be returned to her once she testified or performed sexual favors. While Taylor F. argues that various criminal charges against her were fabricated by the District Attorney's Office in order to delay her regaining custody, she cites no evidence in support of this claim. She also fails to address the fact that some of these charges were issued in other jurisdictions, not in Lawrence County, and that she either pled or was found guilty of disorderly conduct, possession of a controlled substance and other criminal charges.

In short, once the court determined that Taylor F. met the requirements of that plan, T.F. was returned to her.

Thus, Taylor F. has failed to create any genuine issue of material fact that supports T.F.'s procedural due process claim against any of the Defendants, and therefore, each of them are entitled to summary judgment as a matter of law.

b.   Substantive Due Process Claim

Taylor F. asserts that Defendants violated T.F.'s rights to liberty and privacy in his mother's custody without undue interference, including his right of familial integrity secured by the Fourteenth Amendment. Defendants counter that as a matter of law, the actions of CYS and Lawrence County as they relate to T.F.'s care and custody do not shock the conscience, and further, that Lamancusa had no role whatsoever with respect to T.F's custody.

It is "the substantive component of the Clause that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "To generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience.'" *Miller*, 174 F.3d at 375 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). In the context of a social worker removing a child from a parent's custody, a claim "requires decision-making by a social worker that is so clearly arbitrary … [that it] can properly be said to 'shock the conscience.'" *B.S. v. Somerset County Children & Youth Servs.*, 704 F.3d 250, 268 (3d Cir. 2013). As Defendants assert, a plaintiff must prove that the government's actions "reach a level of gross negligence or arbitrariness." *Mulholland v. Government County of Berks, Pa.,* 706 F.3d 227, 241 (3d Cir.

21

2013).[20]

The developed record demonstrates that T.F. was removed from Taylor F.'s custody by court order after she engaged in criminal behavior associated with firearms and had her four-month old son with her at the scene of a murder in the early morning hours. Shortly thereafter, Taylor F., who was seventeen at the time, was detained at a juvenile facility after being charged with aggravated assault, resisting arrest and tampering with evidence, and T.F. was removed from her parents' home pursuant to an *ex parte* court order. None of these facts are controverted. Based upon these uncontroverted facts and the potential of abuse or harm to T.F. under these circumstances, his removal from the home was neither ill-conceived nor arbitrary, and therefore, does not shock the conscience as a matter of law.

Taylor F. also claims that continuing to hold T.F. in custody for a substantial period of time also violated his substantive due process rights. However, as the record reflects and as previously discussed, Taylor F. was required to meet the terms of her service plan before regaining custody. The status of Taylor F.'s compliance with that plan was monitored by CYS. One aspect of that plan was to refrain from criminal activity. As the record reflects, after her service plan was established in late 2013, she was charged with criminal conduct multiple times in 2014 and 2015.

Taylor F. notes in her brief that "CYS caseworker Fritz Lang told her that he had never seen 'such an unfair case' in his life." (ECF No. 63 at 5.)[21] What Lang may have meant by this statement is undeveloped in the record and, is, at best, ambiguous, particularly given his sworn testimony in this case regarding Taylor F.'s continued criminal activity and its impact on

---

[20] The brief submitted by Taylor F. does not cite any case law or decisions regarding the legal standards applicable to her claims.

[21] Taylor F. does not identify where she testified to this statement, but it appears on page 58:14-15.

regaining custody of T.F. In fact, Mr. Lang, who was deposed in this matter, testified under oath that the T.F. case did not stand out in any particular way from other CYS cases in which he had been involved. (ECF No. 60 Ex. L at 18:8.) In addition, he testified that Taylor F's "inability to stay out of trouble with the law prevented her from moving forward with getting her son back into her custody" (*id.* at 13:22-25) and that "there were several run-ins with the law that gave us concern to have her child back in her home in a safe manner" (*id.* at 14:4-6). *See also id.* at 26 (identifying her pending criminal activity and charges on a Permanency Review Order).

Taylor F. also claims that T.F. was withheld from her custody until she agreed to testify at Platt's trial. Much of the evidence on which she relies relates to her belief that she would regain custody after testifying at the preliminary hearing on December 17, 2013, before she ever met Lamancusa and well before the Platt trial in 2016. See ECF No. 59 Ex. A at 45:15-17 (upon T.F. first being taken, she states "They promised me that I would get him back if I testified, which I did, and I did not get him back."); *id.* at 50:10-14 ("I testified at the preliminary hearing. Tom Minett and whoever the lady was with him promised me my son back whenever I testified, so I testified at the preliminary hearing, and did not get him back."). Other testimony by Taylor F. is unclear. *Id.* at 59:19-23 (when asked who said something that made her connect her testimony at trial to getting her son back, she said "Tom Minett, Thomas Minett; whoever the lady was, I think her name was Jessica; public defenders; Lamancusa; everyone; CYS. CYS always told me they needed to—they would contact the district attorney;" *id.* at 60:14-18 (when asked to elaborate on what she meant, she stated "I would ask for more visits, or why I didn't get him back, why I—I would ask then why nothing is increasing, things of that nature, and then they would always tell me that they would have to contact the district attorney's office.").

Notably, when she later testified at the Platt trial, Taylor F. represented under oath that

she was not promised any help by the police or the District Attorney's Office with her CYS problem. (ECF No. 60 Ex. C at 62:17-25.)

As this evidence suggests, it is less than clear what was said, when it was said and by whom Taylor F. claims that these statements were made. Reviewing the evidence in the light most favorable to Taylor F. and giving her the benefit of all inferences, however, it is apparent that the parties dispute what she was told, if anything, about the impact of her testimony on regaining custody of T.F., or when this may have occurred. Regardless, based upon all of the record evidence, she has failed to show that these disputed facts are material to the resolution of the substantive due process claim brought on behalf of T.F.

 First, there is no evidence of record that T.F. was placed in foster care because the District Attorney's Office wanted Taylor F. to testify and/or collaborated with CYS in this effort. Rather, T.F. was removed pursuant to a court order from Taylor F.'s custody based upon legitimate issues about his wellbeing.

The adjudication hearing at which T.F. was adjudicated dependent by the court based upon a finding that T.F. lacked proper parental care was on December 17, 2013, the same day as the Platt preliminary hearing at which Taylor F. testified. She entered into a service plan with CYS with the goal of reunification, one element of which was refraining from criminal activity. Therefore, it cannot be reasonably disputed that Taylor F. knew as of December 2013 that her preliminary hearing testimony would not result in the return of T.F.

Moreover, it is undisputed that Taylor F.'s criminal activity was a substantial factor in delaying reunification thereafter. In fact, it was a necessary prerequisite to regaining custody. As reflected in the Contact Summary/Running Dictation of CYS, there is not a single entry that reflects or even suggests any discussion, interaction or collaboration between CYS and

24

Lamancusa or the District Attorney's Office. Similarly, there is no reference in these contemporaneous records to any statements by Taylor F. that any promises were made to her by the District Attorney or his office. In fact, as early as January 9, 2014, Taylor F. asked her CYS caseworker what she had to do to get her son back. (ECF No. 60 Ex. E at 18.) She was told by CYS at that time to complete her plan and remain cooperative, and the courts would decide. In multiple entries thereafter, CYS caseworkers expressed concerns about her repeated criminal charges. (*See, e.g.,* ECF No. 60 Ex. E, 10/24/14; 10/30/14; 12/11/14; 2/24/15.)

Taylor F. was specifically told by her caseworker that her criminal issues were hindering her ability to reunify with T.F. It is uncontroverted that when she was released from jail after her arrest in January 2015, Taylor F. understood that because of her police involvement, it would be awhile before reunification occurred. Shortly thereafter, in February 2015, she was arrested again. As Mr. Lang testified, Taylor F.'s inability to stay out of trouble prevented her from moving forward with getting her son back into her custody. She was later advised on November 9, 2015 that CYS was recommending the status quo to the court because they were waiting to see what happened to her pending criminal charges. (*Id.*)

While there were communications between CYS and the District Attorney's Office about Taylor F.'s criminal issues and charges, there is no evidence of record that the D.A.'s Office directed CYS how to proceed or that Lamancusa had any conversations with any of his assistants or with anyone at CYS about Taylor F.'s custody situation. Further, Taylor F. has offered no evidence that any of the Defendants interfered with or prolonged the custody proceedings or made false representations to the court to delay the return of T.F. Indeed, given the periodic court proceedings to evaluate the custody situation, it was the court, not CYS, Lawrence County, the District Attorney's Office or Lamancusa, who had the only authority to determine T.F.'s

custody. Thus, even if CYS or the District Attorney's Office told Taylor F. after the preliminary hearing that T.F. would be returned to her if she cooperated and/or testified, the court determined when reunification was in the best interests of T.F.

Taylor F. suggests that a "litany of serious charges" were falsely brought by Lamancusa in order to delay reunification. However, many of these charges were brought by law enforcement agencies in other jurisdictions, not in Lawrence County, and she ultimately entered into plea bargains and/or was convicted of disorderly conduct, possession of a controlled substance, falsification of statements, "something to do with a stolen motor vehicle" and some other "drug related charge" during the time period at issue. Additionally, there is no record evidence that suggests that there was some agreement or understanding between Lamancusa and other law enforcement agencies to falsely charge Taylor F.

Notably, if the District Attorney, someone working in his office or CYS promised Taylor F. that T.F. would be returned to her once she testified at the criminal trial, then one would expect that scenario to have unfolded immediately. But her existing issues with pending charges as of April 2016 did not "abruptly resolve" as she claims. Taylor F. claims that Lamancusa stopped interfering with reunification after she testified at the Platt criminal trial. However, the evidence on which she attempts to rely relates to how pending criminal charges against her were resolved because of her cooperation in testifying (ECF No. 60 Ex. K at 40). Moreover, her testimony had no impact on her status with CYS. As of May 17, 2016, a month after her testimony at the murder trial, her caseworker noted that CYS was still waiting for her drug charges to pan out before moving forward. (ECF No. 60 Ex. E at 150.) It was not until after a court hearing on July 7, 2016 that CYS was directed to increase its reunification efforts. (*Id.* at 162.) Nothing in the CYS records reflect any impact of her trial testimony upon its

recommendations.

Taylor F. is nonetheless correct that because of her cooperation by testifying at the Platt trial, some of her pending charges were resolved, and this sequence of events was partially responsible for allowing her to meet the requirement of her service plan that she refrain from criminal activity and ultimately regain custody of T.F. This does not demonstrate, however, that Defendants prevented her from reuniting with her son until after she testified at the trial. Once all of her pending charges were resolved and a custody proceeding was held by the court in which it was determined that CYS should increase its reunification efforts, the process to transition T.F. back to her custody began, which was accomplished in October 2016. This was six months after her testimony. Thus, even accepting her claim that someone told her that she would be reunited with T.F. if she testified at the Platt criminal trial, pursuant to appropriate court oversight and CYS supervision, T.F. remained in CYS custody until the court found that T.F. could be returned to Taylor F.'s custody.

The basis for T.F.'s removal and placement in foster care was a finding by the court that T.F. lacked proper parental care. Even if Taylor F. was promised reunification as a result of her testimony, to do so before she fully complied with her service plan would not have been in the best interests of T.F. Moreover, the court was not bound by any promise that might have been made to her, a promise that she never mentioned to CYS, and it was ultimately up to the court to make all custody determinations, not CYS, Lamancusa or the District Attorney's Office. In short, given Taylor F.'s on-going legal issues and the nature of her service plan, it hardly shocks the conscience that T.F. was returned to her only after she met all of her service plan requirements and the court approved reunification in October 2016.

Thus, Taylor F. has failed to point to any genuine issue of disputed material fact that

supports T.F.'s substantive due process claim. Simply put, there is no evidence that Defendants' conduct throughout the time that T.F. was in foster care and under the supervision of CYS shocked the conscience or violated T.F.'s Fourteenth Amendment rights. *See Bilups v. Penn State Milton S. Hershey Med. Ctr.*, 750 F. App'x 97, 100-01 (3d Cir. Sept. 12, 2018) (requiring parent to meet conditions of safety plan even after he was acquitted of having abused a child was not a conscience shocking action by CYS).

Accordingly, as Defendants are entitled to judgment as a matter of law, their motion for summary judgment will be granted with respect to Count I.

    2.  Count II

In Count II, Taylor F. alleges a conspiracy to deprive T.F. of his rights. Defendants assert in their summary judgment motion that she has failed to demonstrate any violation of T.F.'s rights and therefore, no conspiracy to violate them could exist. They also contend that it is legally impossible for the County, CYS and Lamancusa to conspire with each other.

"To state a section 1983 conspiracy claim, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Marchese v. Umstead*, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000) (citations omitted). As explained above, Taylor F. has not created any issue of material fact that supports her claim that T.F.'s civil rights were violated regarding his removal from Taylor F.'s custody and his eventual return. Therefore, in the absence of any facts that support a deprivation of T.F.'s civil rights, the conspiracy claim necessarily fails.

Even if Taylor F. had pointed to issues of fact that could support the conspiracy claim, it nonetheless fails as a matter of law. CYS is an agency of Lawrence County and acts on the County's behalf. Lamancusa is a Lawrence County official. *B.S.*, 704 F.3d at 254 n.5. Therefore,

these actors are considered as one and cannot conspire with one another. *See Lande v. City of Bethlehem*, 457 F. App'x 188, 193 (3d Cir. Jan. 10, 2012) ("a governmental entity and its agents—such as the Department and individual officers here—cannot conspire because they are considered one and, therefore, the 'two or more persons' requirement is not met.")

Taylor F. also sued Lamancusa in his individual capacity, but she cites no evidence that Lamancusa had any involvement in the events underlying T.F.'s removal from Taylor F.'s custody or his eventual return to her custody. Lamancusa has no role or input in CYS matters. (ECF No. 60 Ex. K at 30-32, 36, 43-45.) He was not personally involved in the criminal trial of Leon Platt or the removal of T.F. from Taylor F.'s custody. (*Id.* at 6.) Moreover, Taylor F. did not have any conversations with Lamancusa about T.F.'s CYS status on any of the three occasions when she met with him. (ECF No. 59 Ex. A at 138-46, 170-86, 220-21.) Finally, it was the Court that issued orders directing both the removal of T.F. and his return to Taylor F.'s custody.

Accordingly, Defendants' motion for summary judgment will be granted with respect to Count II.

### 3. Count III

Taylor F. also asserts a claim on behalf of T.F. against the County and CYS for failing to protect him while he was placed in foster care.

As a general proposition, the government does not have a duty to protect individuals from private violence. A duty may arise out of certain "special relationships." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 197-98 (1989). The Court of Appeals for the Third Circuit has held that "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative

duties. The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under section 1983." *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000).

Taylor F. alleges that CYS and the County failed to respond to her concerns about the treatment T.F. received while in foster care. However, the uncontroverted record fails to support this contention. During supervised visits on February 21 and 24, 2014, Taylor F. complained that T.F. had a diaper rash and what appeared to be burn marks on his chest and bruising. A CYS supervisor spoke to Taylor F. about her concerns, examined T.F. and noted only the existence of a mild diaper rash and no signs of bruising. Taylor F. had another visit with T.F. on March 4, 2014 and did not raise any additional concerns.

Taylor F. attended T.F.'s previously scheduled doctor's appointment on March 6, 2014, and the doctor indicated that T.F. did not have any bruises and that his rash was common and not a cause of abuse or neglect. As a result, CYS concluded that any report of abuse or neglect by the foster parents was unfounded.

In September 2014, CYS received reports from a third-party service provider nurse that T.F. was losing weight and may be malnourished or have a stomach issue. T.F. was taken to the emergency department and then to his primary care physician, but no concerns were noted. When he continued to lose weight, he was taken to Children's Hospital on October 17, 2014, where he was diagnosed with failure to thrive. There is no evidence that this diagnosis stemmed from abuse or neglect. A state agency apart from CYS investigated the foster home and determined that any allegations of abuse or neglect were unfounded.

The evidence of record conclusively establishes that during the time that T.F. was in foster care, issues were recognized and promptly addressed. CYS responded to Taylor F.'s

concerns about T.F.'s treatment in foster care. Medical treatment was sought when necessary. While T.F. was admitted to the hospital based after it was reported to CYS that he was losing weight, Taylor F. has presented no evidence that his failure to thrive was a result of abuse or mistreatment. Indeed, these allegations were investigated and determined to be unfounded.

Simply put, Taylor F. has failed to create any issue of fact to support her allegations that T.F. was subjected to abuse or neglect while in foster care. Therefore, Defendants' motion for summary judgment will be granted with respect to Count III.

B.  Supplemental Jurisdiction

In Counts IV and V, Taylor F. asserts state law claims on her own behalf against Lamancusa for assault and battery. The supplemental jurisdiction statute provides that:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Taylor F.'s state law claims in Counts IV and V arise out of the same circumstances and are so related to their federal claims that they form part of the same case or controversy. *See Lyon v. Whisman*, 45 F.3d 758, 761 (3d Cir. 1995).[22]

While the Court concludes that these claims are within the Court's supplemental jurisdiction, they should be dismissed pursuant to 28 U.S.C. § 1367(c)(3) as Defendants also contend. Subsection (c) provides that a district court may, in its discretion, decline to exercise jurisdiction if any of four conditions are met. One of these conditions is if "the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). The Court of Appeals

---

[22] In the Court's Memorandum Opinion and Order on the motion to dismiss filed on May 28, 2019, the Court concluded that the claims were within the Court's supplemental jurisdiction. (ECF No. 23 at 17.)

has stated that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)). *See also Yue Yu v. McGrath*, 597 F. App'x 62, 68 (3d Cir. 2014) (district court acted within its discretion when it "dismissed all of the remaining state and common law claims after awarding summary judgment to Defendants on all of the federal claims over which it had original jurisdiction."); *Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1285 (3d Cir. 1993) (retaining jurisdiction was appropriate *after* court already held a trial on the merits).

The Court of Appeals has held that "'substantial time devoted to the case' and 'expense incurred by the parties' did not constitute extraordinary circumstances" for retaining jurisdiction. *City of Pittsburgh Comm'n on Human Relations v. Key Bank USA*, 163 F. App'x 163, 166 (3d Cir. 2006) (quoting *Tully v. Mott Supermarkets*, 540 F.2d 187, 196 (3d Cir. 1976)).

The only other possible consideration would be that the two-year statute of limitations on Plaintiff's state law claims for assault and battery has expired. 42 Pa. C.S. § 5524(1). However, Congress anticipated this issue and addressed it in the supplemental jurisdiction statute:

> The period of limitations for any claim asserted under section (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d). This section ensures that Plaintiff's state law claims will not be considered time-barred as long as she reasserts them in state court within 30 days of the dismissal of this action. *Hedges*, 204 F.3d at 123.

Although Defendants raised the issue of supplemental jurisdiction in their supporting brief, Taylor F. did not address supplemental jurisdiction beyond asserting that since Defendants' motion for summary should be denied on the merits, the Court would continue to have original jurisdiction in this matter. As such, Taylor F. has not demonstrated that issues of judicial economy, convenience, and fairness to the parties would justify retaining jurisdiction given the dismissal of the federal claims.

Therefore, Counts IV and V will be dismissed pursuant to § 1367(c)(3) without prejudice to refiling them in state court.

For these reasons, Defendants' Motion for Summary Judgment (ECF No. 56) will be granted with respect to the federal claims and Plaintiff's state law claims will be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

An appropriate order will be entered.

Dated:  12/28/2020

s/ Patricia L Dodge
PATRICIA L. DODGE
United States Magistrate Judge